ONE–PIECE BIFOCAL LENS CO. v. BISIGHT CO. et al.

(District Court, D. Maryland.    October 26, 1917.)

1. PATENTS ⬤⟞328—VALIDITY—BIFOCAL LENS.
    The Mayer patent, No. 798,435, for a single piece bifocal lens, is void; the Conner patent, No. 932,965, which is for the same thing, being entitled to priority.

2. PATENTS ⬤⟞65—"ANTICIPATION"—PRIOR PUBLICATION.
    To constitute an anticipation of a patent for an article of manufacture by a prior patent or other printed publication, it is not necessary that such publication should describe the process of manufacture; but it is sufficient if it clearly and accurately describes the very thing claimed in the later patent.
    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Anticipation.]

3. PATENTS ⬤⟞328—ANTICIPATION—BIFOCAL LENS.
    The Alexander patent, No. 954,772, claim 1, for "a solid bifocal lens, consisting of a single crystal, having formed upon one face a pair of concentric ground visual surfaces," is void for anticipation. Claim 3, which is for the same lens after it has been subjected to a further operation, also *held* invalid.

4. PATENTS ⬤⟞72—ANTICIPATION—ARTICLE OF MANUFACTURE.
    Anticipation is not avoided by the fact that in the course of the manufacture of the patented product something is formed which is new and useful, if the patented product, when finished, is like something before described.

5. PATENTS ⬤⟞328—VALIDITY AND INFRINGEMENT—BIFOCAL LENS.
    The Conner patent, No. 932,965, for a bifocal lens, comprising one piece of glass having an upper distance field, a lower and smaller near field,

⬤⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and an arched division separating the two fields, but the lens at the curved line of joinder having a uniform thickness through both fields, was not anticipated and is valid; also *held* infringed.

6. PATENTS ☞328—VALIDITY AND INFRINGEMENT—PROCESS OF MAKING BIFOCAL LENS.

The Conner patent, No. 925,802, for a process of making a bifocal lens, claim 1, is valid. Claim 2 is invalid, as not for a particular process, but for every way of making the product. Claim 1 also *held* infringed.

7. PATENTS ☞11, 99—PROCESS PATENT—DOUBLE PATENTING.

A valid patent cannot be granted for a process, unless the patentee tells how to practice it, and if, in making a machine for that purpose, he exercises his inventive skill, he may patent the new machine, and it will not be a case of double patenting, unless the process cannot be practiced except by such machine.

8. PATENTS ☞328—VALIDITY—MACHINE FOR MAKING BIFOCAL LENSES.

The Connor patent, No. 836,386, for a machine for producing bifocal lenses, claim 1, *held* invalid, as too broad.

In Equity. Suit by the One-Piece Bifocal Lens Company against the Bisight Company and Benjamin Mayer. Decree for complainant.

Edwin F. Samuels, of Baltimore, Md., Virgil H. Lockwood, of Indianapolis, Ind., and Edward Rector, of Chicago, Ill., for plaintiff.

W. Thomas Kemp, of Baltimore, Md., William M. Stockbridge, of New York City, Cyrus N. Anderson, of Philadelphia, Pa., and Victor D. Borst, of New York City, for defendants.

ROSE, District Judge. Five patents are here in suit. Four of them belong to the plaintiff, which says the defendants infringe all of them. The individual defendant, Mayer, was the patentee of the fifth. It is now owned by the Bisight Company, his corporate codefendant. After it was issued, the Patent Office declared an interference between its single claim and the pending application, which ultimately resulted in one of the plaintiff's patents now in suit. That interference was determined in favor of the plaintiff's patentee. The plaintiff now asks that the finding then made may be carried to its logical conclusion by a decree canceling and declaring null and void the Mayer patent.

The patents before the court relate to one-piece bifocal lenses, to methods of making them, or to the tools and machinery used in fashioning them. Many people need stronger glasses for near than for distant vision. It is not always easy to remember to carry two pairs. To be continually taking one pair off and putting the other on, even if both are at hand, uses up both time and temper. It is better to have both of them in the same frame.

The earliest known bifocal was one of the inventions of the many sided Franklin. He took two lenses having the needed difference in strength, and so cut them that they could be put into the same frame. The weaker, for distant vision, was placed in the upper part of the frame; the stronger in the lower. The bottom edge of the former and the topmost edge of the latter were horizontal, so that they would fit together more or less snugly. This device, like almost everything else which came from that incarnation of practical common sense,

worked, and in many ways worked well; but, while it was simple, it was also crude. It did not improve its wearer's appearance. The necessarily conspicuous line between the lenses was unpleasant to him. Dirt and dust worked their way in. A slight loosening of the frame would let the glass fall out. It was obvious that a bifocal in which both lenses were combined in a single piece of glass might be free from most of these objections; but the practical difficulties in the way of making such a device were great.

According to the testimony, the first important attempt to improve upon Franklin's glasses was the invention of what is spoken of in the record as the "old one-piece solid bifocal." In it the entire glass was first given the power required for the stronger or near field of vision, and then a portion of its upper surface was ground down so as to reduce its power. It followed, from this method of manufacture, that the division line between the two portions took the form of an up-curved or reversed arch. This was undesirable. A limited area will suffice for the strong lens, needed for near vision. The weaker should furnish a much wider field of view. Moreover, in a glass so made, there is a marked prismatic effect at or near the line at which the lenses of unequal power come together.

This old solid bifocal came upon the market nearly 70 years ago. It never became popular. The demand for it was never as great as for the Franklin, and now, when better lenses are available, it has practically gone out of use. The maker of it started with the strong lens, and obtained the desired inequality of power through weakening a portion of it by grinding it down.

Some 30 years ago it occurred to another inventor to reverse this process. He took a lense of the lesser power, needed for the distant field, and, by cementing another lens upon it, gave a part of its surface the added strength required for near vision. This resulted in a bifocal which was and still is popular. It can be cheaply made, and it serves its purpose well. It is still sold in far greater quantities than are its more modern, more theoretically perfect, but much more expensive, rivals. It has some shortcomings. In it the line of division between the near and distant field is marked, and forms quite a shoulder which is more or less unpleasant to the eye, and which has a tendency to collect dirt and dust. These objections are more or less felt, even when the upper edge of the added lens is ground as thin as is mechanically possible, and of course, when so ground, the thin edge may, and it sometimes does, break and chip.

Still another experimenter in this field of endeavor took Franklin's device as his starting point. He made his two fields separately. He cut each of them to the desired size and shape and cemented their edges together. In practice this made a bifocal in which the stronger field was circular in outline, or nearly so, and was, as compared with the weaker, limited in area. Inspired by their hopes, rather than by their modesty, the makers of this device called it the "Perfection Bifocal." It was useful, and is used.

Grinding down and building up, as well as clamping and cementing together, had not attained what was hoped for. About 1899 the

"Kryptok" was devised. Its inventor did not attack the problem, then apparently unsolved, of how to grind upon the same side of a single piece of glass two curvatures and thereby make an effective and comfortable bifocal. He found a way around this difficulty. He made a lens, the entire surface of which was ground to the same curvature, but which was a true and useful bifocal nevertheless. He availed himself of the difference between the refracting powers of crown and flint glass. He made the upper part of his lens, needed for the distant field of vision, of the former, and that for the nearer of the latter. He cut a recess in the lower edge of the crown glass, and fitted the upper edge of the flint glass therein. At first he cemented one to the other, but before long it was found that they could be fused with more satisfactory results. After they were united, in whichever way the union was effected, the common surface was given the desired uniform curvature. The result is a lens which is largely used. For a more detailed review of the bifocal art down to the invention of the Kryptok, reference may be had to the opinion of Judge Van Valkenburgh in Kryptok Co. v. Stead Lens Co. (D. C.) 207 Fed. 85, subsequently adopted by the Circuit Court of Appeals for the Eighth Circuit. 214 Fed. 368, 131 C. C. A. 144.

Satisfactory as the Kryptok in many ways is, like other human devices, it does not reach to the ideal conceivably attainable. Some of its shortcomings are due to limitations imposed by its distinctive methods of manufacture. There was and still is room for further exercise of inventive skill.

The story thus far told shows that it must have been hard to make a solid one piece bifocal. The "Cemented" and the "Kryptok" lenses bear witness that those most highly skilled in the art felt that it was easier to build up a bifocal than to fashion one out of a single piece of glass; a fact not without its lesson as to what was the true state of things in this industry prior to the disclosures of the patents in suit. The effort to make a better bifocal continued. At or shortly after the beginning of the present century, at least three persons in different parts of the country were independently working at the problem. To the rights of two of these, Alexander and Conner, the plaintiff has succeeded. The defendant, Mayer, is the third.

[1] Alexander applied for a patent on August 27, 1903, and Conner on October 23d of the same year, less than 60 days later. On July 27, 1904, after their applications had been pending nearly 2 years, an interference was declared as to certain features of the inventions respectively claimed by them. On June 19, 1905, priority was awarded to Alexander, and the patent in suit, No. 954,772, was issued to him on April 12, 1910. On March 10, 1905, while the Alexander-Conner interference was still pending, Mayer made his application, which was also for a single piece bifocal lens. Somebody in the Patent Office was napping. It was not at the time noticed that his single claim was in direct interference with a feature of Conner's invention, not involved in the Alexander interference. Mayer's application had a comparatively swift and easy passage through the office, and he obtained his patent, No. 798,435, on August 29, 1905, less than 6 months after he

first asked for it. Subsequently an interference between his already issued patent and the still pending application of Conner was declared. The examiner of interferences, the board of examiners in chief and the commissioner of Patents concurred in awarding patentable priority to Conner. Mayer took an appeal to the Court of Appeals of the District of Columbia, but abandoned its prosecution. On August 31, 1909, one of the patents in suit, No. 932,965 was accordingly issued to Conner. It contained a single claim which is identical with that of Mayer's patent.

If the decision of the Patent Office in the Conner-Mayer interference was right, the patent to Mayer must be canceled, irrespective of what conclusion may be here reached as to the validity of Conner's claim. The three Patent Office tribunals held that, even if Mayer had been, as he claimed, the first to conceive the inventive idea, he had been guilty of such laches in reducing it to practice that, as against Conner, priority could not be awarded to him. Upon such a question of fact the decision of the Patent Office tribunals, and the abandonment by the defendant of his appeal to the Court of Appeals of the District of Columbia, while not absolutely controlling, are entitled to great weight. Automatic Weighing Machine Co. v. Pneumatic Scale Co., 166 Fed. 304, 92 C. C. A. 206. It is not necessary to invoke that rule here. A careful consideration of all the evidence, not only that before the Patent Office, but that which the defendant now for the first time submits, independently leads to the same conclusion as that reached by the Commissioner of Patents and his subordinates. The Mayer patent, No. 798,435, must therefore be canceled.

[2, 3] The defendants' lens is accurately described in the single claim of that patent, which claim, as already stated, is identical with the Conner patent, No. 932,965, in suit. The defendants necessarily infringe it, if it is valid. Their contention that it is not can be more conveniently dealt with after like objections to the claims of the Alexander patent have been considered. There are five of such claims, but, while the plaintiff relies on all of them, it says that as a practical matter, it is unnecessary to consider any of them, except the first and third. The first reads:

1. A solid bifocal lens, consisting of a single crystal, having formed upon one face a pair of concentric ground visual surfaces.

The defendants say that it is for something which is described in earlier patents. An examination of most of the latter will be unnecessary. In 1866 an American patent, No. 59,995, was issued to one Gregg. He shows a bifocal lens in which the division line between the two fields is similar in curvature to that of Alexander's. He says he "constructs two distinct and perfect segments of lens concentric in one piece of glass, the upper portion having a broad field of vision for the purpose of seeing distant objects, and the lower portion, a lens, with upper edge concentric with the edge of the upper portion, and distinctly defined, adapted to seeing objects near the eye, and having a narrow field of vision." This appears to be a "a solid bifocal lens, consisting of a single crystal, having formed upon one face a pair of concentric ground visual surfaces." It is true Gregg does not tell how

such a lens can be made, and, in view of the history of the art, it is highly doubtful whether he ever made one or knew how one could be made.

In this respect there is not much to choose between him and Alexander. In his interference proceedings with Conner, the latter testified that he had never made such a lens as that described in his patent. It does not appear that any one else has ever made one in the way he tells the public they may be made. Under such circumstances, it goes without saying that the expert witnesses differ as to whether one could be made by his process. The decided weight of the testimony is that it could be. In the sense of the law, the device is therefore useful. Nevertheless, it has never been manufactured in the way disclosed in the patent. It is highly probable, therefore, that the method there set forth is, from a commercial standpoint, useless; but, if the fact were otherwise, could Alexander's first claim be upheld? It is for a product, not for a process. It is void if the thing it claims has been described in any printed publication prior to his conception of it. What will constitute such a description? The plaintiff answers that the product has not been described, unless it has been actually produced, or some practical means of producing it has been discovered or is known. As so affirming or assuming, reference is made to a score of cases. All of them have been examined. Many of them are clearly beside the mark. Not one is directly in point. Some of them deal with process patents. Those are authority for nothing more startling than that a process is not described, unless such description of it is given as will suffice to teach one skilled in the art how he may practice it. In others, machine patents were in suit. Either a machine patent will work, or it will not. If it will not, it is without patentable utility and void therefore. It is unnecessary to go into any inquiry as to anticipation. On the other hand, if it will work, a description of something which will not is not a description of it.

In a number of the cases cited by the plaintiff, product patents were involved. In such of them as held that a patented thing had not been anticipated by some previous description set up against it, the court was of opinion that such earlier description failed in some substantial respect to describe the thing claimed in the patent in controversy. Plaintiff calls attention to the fact that, in the last edition of Walker on Patents, the statement that a claim for an article of manufacture may be anticipated by a prior patent or printed publication which describes the article without describing any process of making it is qualified by the proviso that "the knowledge of the article would teach a skillful mechanic how to make it." Walker on Patents (5th Ed.) 71.

For the rule and its asserted limitation, two authorities are cited: Cohn v. U. S. Corset Co., 93 U. S. 366, 23 L. Ed. 907; In re Schaeffer's, 2 App. D. C. 8. In the former, the Supreme Court applied the rule, but used language which could be understood as recognizing the limitation. In the beginning of the discussion of the case, Justice Strong, after pointing out that an earlier English patent would be fatal to plaintiffs, if it described sufficiently the manufacture described and claimed in plaintiffs' specifications, went on to say:

"It must be admitted that, unless the earlier printed and published description does exhibit the later patented invention in such a full and intelligible manner as to enable persons skilled in the art to which the invention is related to comprehend it without assistance from the patent, or to make it, or repeat the process claimed, it is insufficient to invalidate the patent."

It will be noted that the sentence quoted has reference to other than product patents, and that the requirements with which its description must comply, in order that it shall effectively anticipate, are stated disjunctively. From such a description, persons skilled in the art must be able (1) "to comprehend it"; (2) "to make it"; or (3) "to repeat the process." The last of these alternatives obviously has reference solely to what will suffice to anticipate a process or method patent. Is the second, namely, a description which will tell the skilled "how to make it," required only in the case of an alleged anticipation of a machine patent, and will an earlier disclosure be fatal to a product patent if it enables the well posted in the art "to comprehend it"? The immediate connection in which this statement is found, and the apparent purpose for which it was made, suggests a negative answer, while one in the affirmative is apparently given in the statement of the doctrine held decisive of the case. There Justice Strong said:

"It is quite immaterial, even if it be a fact, that the Johnson specification is insufficient to teach a manufacturer how to make the patented corset. It is enough if it sufficiently describes the corset itself. Neither it nor the plaintiff's specification exhibits the process of making. Neither of them set up a claim for a process. The plaintiff claims a manufacture, not a mode of making it; and the important inquiry, therefore, is whether the prior publication described the article. To defeat a party suing for an infringement, it is sufficient to plead and prove that the thing patented to him had been patented or described in some printed publication prior to his supposed invention or discovery thereof. * * * What is required is a description of the thing patented, not of the steps necessarily antecedent to its production."

Is the force of this language materially weakened by the fact that the court went on to point out that what was known at the time the anticipating Johnson's specification was filed, was sufficient to enable one skilled in the art to make the corset?

The other case cited by Walker (In re Schaeffer, supra) was decided by the Court of Appeals of the District of Columbia some 16 years later. It sustained the Commissioner of Patents in refusing a patent for Alizarin on the ground that it had been described in a technical handbook, although no way of making it was there set forth. The opinion cites with approval 1 Robinson on Patents, § 330, to the effect that the method of producing the manufacture forms no part of the invention of it and "therefore need not be described." It is, however, true that the court did go on to suggest that, in the light of what was known at the time the anticipating description was published, one skilled in the art would have no difficulty in devising a way of making it.

There may be found in the books language which does not always accurately discriminate between the disclosure necessary to sustain a patent for an article of manufacture and that which will anticipate a subsequent patent for such article. One who gets a patent must pay the price. In return for his monopoly for a limited time, he must tell the public how it may enjoy the use of his invention, after his exclusive

rights in it have come to an end. He does not do this if he merely describes a new article, without telling how it can be made. Heming Manufacturing Co. v. Cutler-Hammer Manufacturing Co., 243 Fed. 595.

It does not follow that an accurate description of some new product may not extend the limits of the public domain. In the invention of any article of manufacture, there may be and usually are two steps— the conceiving or imagining of the possibility of such a thing, and the devising of a way of making it. Sometimes one, sometimes the other, of these may require the greater and more unusual exercise of inventive genius. The forming of a conception clear-cut enough to admit of intelligible description may be easy, or it may be difficult; but, when it has been accomplished, one part of the inventor's task is finished. When such a description is put in a printed publication, it is, from the standpoint of the patent law, done for all time. It makes no difference whether the printed publication be a patent or other printed document. If it be a patent, it is immaterial whether it be valid or not. If the man who formed the conception did not go further, and find out and describe some way of making the product, he may not have gone far enough to give himself any rights; but the publication of it in a patent, void though the latter may be, is a description in a printed publication.

The second step—that is, the devising of some way of making the article—still remains to be taken. He who first takes it is a pioneer in that particular field. He will have the right to claim broadly his way of making it, and his claims may be entitled to such a liberal construction that all other means that embody his thought, will be held equivalents, and as such subject to his monopoly. But that monopoly cannot cover anything which he did not invent. Under the patent laws, he cannot be the inventor of anything which has been previously described in any printed publication. The description under consideration is one which does not tell how to make the article it describes. It is one published at a time when those skilled in the art would not either from its disclosures or their knowledge, or from both combined, know how to produce it. For the reasons already stated, it is believed that, even under such circumstances, it may anticipate a later patent. It is, however, certain that, before it can be held to do so, it must affirmatively appear, beyond the opportunity for reasonable question, that it does in all respects clearly, accurately, and minutely portray the very thing claimed in the patent assailed.

Little attention will be given to the deductions of expert witnesses. A deaf ear will be turned to their ingenious arguments that, by putting together statements in one earlier description with others in another, a complete anticipation can be made out. Slight weight will be given to their contentions, not because they are not honest, able, and skilled, but because it is practically impossible for any man, with the disclosure of a patent in suit before him, to put himself in the precise mental attitude in which all the world was before those disclosures were made. It may now seem very clear that any omission from the earlier description of an element, quality, or characteristic of the pat-

ented thing, in view of what was then known, of what it disclosed, and of the purpose to which the article was to be put, must have been due solely to the fact that the author of the description thought it was superfluous to mention something, the presence of which he felt would be taken for granted. To act under such conclusion would be unsafe in any case in which the description set up as an anticipation did not tell how the thing described could be made, and when no way of making it was then known to the art. We have nothing the author of the earlier description did by which to complete, illustrate, or check up what he said. His words are all we have, and we will not be justified in adding to them, no matter how obvious such an addition may now seem to be. Nevertheless, even when subjected to the severe test thus laid down, it would seem that Gregg did describe a solid bifocal lens, consisting of a single crystal, having formed upon one face a pair of concentric visual surfaces, and, if he did, he described an article which Alexander sought to cover by his first claim, because at the time of Gregg's invention, and to-day, all lens surfaces are ground. That claim must therefore be held invalid.

How is it with the third claim of the same patent which reads:

3. A solid bifocal spectacle or eyeglass lens, consisting of a single crystal, having formed upon one face a pair of concentric visual surfaces of different dioptrics, one side of the outer surfaces being removed whereby the inner surface lies at or near one edge of the finished lens.

From what has already been said, it follows that Gregg describes a solid bifocal spectacle or eyeglass lens, consisting of a single crystal, having formed upon one face a pair of concentric visual surfaces of different dioptrics. The defendants say there could be no invention in cutting off a piece of the lens as originally made, so that what was originally the inner surface lies at or near one edge of the finished article. It is not likely that any one would argue that there could be. Cutting a lens is as familiar an operation to a lens maker as sawing a board is to a carpenter. The defendants contend that the claim is necessarily bad, because it is merely for an article old in the art, after that article has been subjected to an operation which involved no exercise of inventive genius. The plaintiff replies that the defendants misunderstand and misstate the issue. The claim is for a new article of manufacture. Upon the record it does not appear it was ever made before the date of patentee's conception. The claim was good, unless the lens was previously described in a printed publication. Was it? The plaintiff answers, No—not because the claim in suit requires that the new article of manufacture shall have been subjected to a well-known operation of the lens maker's art, but because the lens which, subjected to the operation, would take the form specified, was a lens which, as originally made, differed in material respects from any lens previously described.

The description of the invention and the way of making it, given in the patent, shows that the lens of the third claim before one side of its outer surface has been removed, has upon it two faces of different dioptrics, of which that of the greater power is circular in shape, while that of the lesser completely surrounds the more powerful. This lens

has the appearance of a round target with a circular bull's-eye in its center. Such a construction has a number of practical advantages, lending itself, as it does readily, to the operations of polishing and finishing. In point of fact, all the makers of solid one-piece bifocals now use this target lens. It has, therefore, patentable utility. There is no evidence that it was in fact ever made before the date of Alexander's conception of it, and no reason to believe that it was, nor was it ever described in any printed publication. It is true that there are shown, in a number of the patents of the prior art, finished lenses which might have been made from such a lens as that shown and claimed by Alexander in his third claim; but there is no evidence that they were in fact so made, and, as already stated, there is no evidence that any of them was ever made at all. It must therefore be held that the target lens has not been anticipated by any previous description.

[4] Defendants contend, however, that claim 3 is not for a lens which has the target shape; but it is for a finished lens which, in shape and other characteristics, differs not at all from the lenses shown in the patents to Gregg and to others in the prior art. They assert that it makes no difference that, in the course of the manufacture of the patented product, something was formed which was new and useful, if the patented product, when finished, is like something before described. The thing formed in the process of manufacture might be, if new and useful, itself patentable, because it had never been previously described; but the finished thing cannot be, because it, though produced in another way, is the same thing which had been theretofore described. Risdon Iron Works v. Madart, 158 U. S. 84, 15 Sup. Ct. 745, 39 L. Ed. 899. This contention is sound, and it follows that claim 3 of the Alexander patent must also be held invalid.

## Conner Product Patent, No. 932,965.

[5] This patent has but a single claim, which reads as follows:

A bifocal lens comprising one piece of glass, having an upper distance field, a lower and smaller near field, and an arched division separating the two fields, but the lens at the curved line of joinder of the upper and lower fields having a uniform thickness through both fields, whereby the said division is practically free from prismatic effect.

This is identical with the single claim of the Mayer patent in suit. As already stated, the plaintiff seeks a declaration under section 4918 (Comp. St. 1916, § 9463) that the Mayer patent is void. The defendants say it is not, but at the same time in view of the possibility that the court may disagree with them, very strenuously argue that the Connor patent is void, for reasons which, if sound, necessarily require a declaration that the Meyer patent is equally worthless.

From what has been said, there is no question that the prior art does describe a bifocal lens, comprising one piece of glass, having an upper distance field, a lower and smaller near field, and an arched division separating the two fields. The only question is whether there is shown a lens of those characteristics, which, at the curved line of joinder of the upper and lower fields, has a uniform thickness through both fields.

The defendants contend that the Hanna patent, No. 306,918, of October 31, 1884, does describe such a structure. I do not think so. It cer-

tainly does not, except with the aid of the theories, perhaps the guesses, of the expert witnesses. ·

The defendants strongly rely upon English patent to Debenham, No. 25,110, November 29, 1899. That patent is probably a worthless one, but it does describe a one-piece bifocal lens in which there is no raised edge at the junction of the two powers, and it adds that, where there is, such an edge is not polished, but left rough and blackened and covered by a thin metal or other opaque band to prevent the eye from being dazzled by reflections or refractions. An expert witness in patent causes, or a member of the patent bar, may feel that Debenham gave a clear description of the lens Conner claims and of the lens the plaintiff. and the defendants alike made; but it is not likely that anybody else would. The testimony shows that it is desirable that the line of division between the two lenses should have the property which Connor's has. Such a lens does not appear to have been anticipated, and is valid. If so, there is no question that defendants' device infringes it.

## Conner's Method or Process Patent, No. 925,802.

[6] Conner's method or process patent, No. 925,802, has two claims, the first of which reads as follows:

The process of making a bifocal lens from one piece of glass, including as a step therein the simultaneous generation of two concentric spherically disposed visual surfaces of different dioptrics upon one face of a piece of glass.

The patent raises the presumption that Conner was the first who, in making a bifocal lens from one piece of glass, simultaneously generated two concentric spherically disposed visual surfaces of different dioptrics upon one face of such piece; and there is nothing in the record to rebut this presumption. The defendants say that, even so, the claim cannot be sustained for two reasons:

(1) It is for nothing other than the operation of a particular machine, and is therefore not for a true process.

(2) That an earlier patent was issued to Connor for the machine, and that to sustain the patent for the process would be to uphold a double patenting of the same invention, the effect of which would be the unlawful extension of a monopoly in the inventive idea beyond the statutory period of 17 years.

It is not always easy to distinguish between a process and the mere result of the operation of a machine. Attempts to lay down and apply. the rules by which it may be done are apt to end in disputes over words rather than over things. As the defendants in their brief well say: "Every case may be said to be sui generis." It sometimes happens that there is but one machine, or one succession of machines, by which the process can be carried out, and that such machines can themselves be put to little, if any, other use. In that event, the process and the result of the action of the machines are practically one, whatever theoretical difference it may be possible to make in words between them. Such, however, is not the case here. The evidence shows that the actual process claimed by Conner is now performed in different shops by the use of several different kinds of machines and tools. It is therefore a true process, as distinguished from the mere result of the working of a

particular apparatus. Aurora Mantle & Lamp Co. v. Kaufmann, 243 Fed. 915.

[7] The suggestion that it is a case of double patenting falls to the ground for much the same reason. A valid patent cannot be granted for a process, unless the patentee tells how to practice it. If no existing machine will suffice, he must make one that will. If in so doing he exercises his inventive skill, there is no reason why he should not patent the new machine. If he invents two or more different machines for doing the same thing, he can patent each of them. If he invents only one, and some one else subsequently invents another, such other person can patent his own invention. The question of double patenting can, in this connection, seldom arise, unless there is only one machine, or series of machines, which will perform the process. That the evidence shows was not the case here. If the claim is valid, it is infringed.

The second claim of this patent is for the process of making—

a bifocal lens from one piece of glass, which process consists in first grinding two concentric spherically disposed visual surfaces of different dioptrics, upon one face of the piece of glass, so that the glass will be smooth and even and have a uniform thickness at the line of junction of said visual surfaces; second, in forming the other face of said piece of glass as desired; and, third, in removing a portion of said piece of glass to give it the form of a finished lens and so that the inner visual surface will lie near one edge of the finished lens.

The defendants point out that the process as described by Conner consists of three steps:

(1) The grinding of the bifocal side.
(2) The grinding of the other or the so-called "prescription" side.
(3) Cutting the lens so that the near and stronger field will be at its lower part.

They say they do not infringe, because they change the order of these steps by cutting the lens after they grind the bifocal side and before they grind the other. This objection can be set aside. These are not steps, the order in the doing of which is important. Aurora Mantle & Lamp Co. v. Kaufmann, supra.

In the process covered by this claim, it is not essential that the two visual surfaces shall be simultaneously generated. The first step is merely the making of the thing claimed in the product patent. There is no invention in cutting off the superfluous glass, and that is all the third element of the claim amounts to. The second element, namely, "in forming the other face of said piece of glass as desired," or, in the language of the trade, "grinding upon the other face the prescription," is not new. If there is a new process here at all, it must be in the combining of the first and second steps.

The plaintiff claims that Conner was the first maker of a solid bifocal to shape two spherically disposed surfaces on one side of the lens and afterwards to grind the other side as the special needs of the particular wearer require. As a matter of fact, it may be so; but, if so, in what did the invention consist? If it was not done before, it must have been because nobody ever wanted to do it. Conner's invention consisted in shaping the bifocal side of the glass, and that was all there was of it. The trouble with this claim is that, in its essence, it is a claim

for every way of making the patented product. It is not a claim for a particular process.

Conner's Machine Patent, No. 836,486.

[8] The Conner machine patent, No. 836,486, has seven claims. It is the first of these that the defendants are said to have infringed, which reads:

Apparatus for producing bifocal lenses including a rotary holder for the lens crystal, and means for grinding two bifocal surfaces of different dioptrics simultaneously on one face thereof, substantially as set forth.

Conner, as has already been held, invented a particular type of bifocal lens. His patent for it, and for the way of making it, has been upheld. He is also entitled to his exclusive rights in any particular machine or combination of machines which he has invented for carrying out or helping to carry out that process or to aid in the making of that product. He, however, cannot claim to monopolize machines which he has not invented. What this claim seeks to cover is all machines which will make his product, provided only that a rotary lens holder forms a part of them. The rotary holder was old in the art. He therefore claims the combining with an old thing of any and every machine or machines, tool or tools, which will achieve a particular result. He cannot claim machines which he has not invented. Indeed, if his claim be sustained, it would cover machines which nobody may have as yet thought of, but which may hereafter within the lifetime of his patent be devised. His monopoly must be limited to what he himself discovered. The claim goes far beyond that—so far that it cannot be saved by the phrase "substantially as set forth." It does not fulfill the statutory requirement that the inventor shall particularly point out and distinctly designate the invention he claims. The first claim of the Conner patent, No. 836,486, must therefore be held invalid.

It follows that the single claim of patent No. 932,965 and the first claim of No. 925,802 are valid, and that the defendants infringe them. The other claims sued on are invalid.

The defendants' contention that the plaintiff has lost its right to relief upon the two claims held valid and infringed, because of laches, cannot be sustained. The defendants received due notice that they were infringing. Under the circumstances revealed by this record, the plaintiff forfeited no rights by its tardiness in bringing suit.

A draft of a decree in the usual form may be submitted.